OPINION OF THE COURT
Joel L. Blumenfeld, J.
The defendant moves to suppress his statement made as a result of a Central Booking Queens (CBQ) interview.[2] The issues faced by the court include:
*274 (1) Whether the promises made in the prosecutor’s statement to the defendant prior to the issuance of the Miranda warnings (hereinafter referred to as the preamble) negated those warnings and rendered the defendant’s statement inadmissible as involuntarily made pursuant to CPL 60.45;
(2) Whether the People’s failure to live up to the promises to investigate the defendant’s version of the facts as made in the preamble constituted acts involving dishonesty, fraud, deception or misrepresentation in violation of rule 8.4 (c) of the Rules of Professional Conduct;[3] and
(3) If the answer to number (2) above is yes, what is an appropriate sanction.
The court denies the motion to suppress the statement pursuant to CPL 60.45. However, the court finds the failure to keep the promise to investigate violated rule 8.4 (c) of the Rules of Professional Conduct and has fashioned what it believes to be an appropriate remedy. These findings are discussed below.
Findings of Fact
On March 13, 2009, between 12:15 a.m. and 12:30 a.m., the police responded to a police radio transmission of a robbery they received 10 minutes earlier and stopped the defendant and the codefendant. The defendant was carrying an iPod with headphones. Although the police officer thought they matched the description given by the complainant, the complainant could not identify either defendant at a showup arranged for him by *275 the police. However, the complainant identified the iPod with headphones seized from the defendant as his.
The defendant (Perez) and a codefendant (Hernandez) were arrested. The defendant made a properly Mirandized statement at the precinct.[4] He was taken to Central Booking Queens.
The following afternoon at 2:35 p.m. — prior to his arraignment — defendant was removed from his holding cell in CBQ and taken to the interview room. Through an interpreter the defendant was interviewed for about 20 minutes by District Attorney Detective Mary Piccone and Assistant District Attorneys (ADA) Anjula Garg and Louisa DeRose. Just before that interview, codefendant Hernandez was interviewed by the same team.[5]
In the interview, after the defendant was introduced to the people in the room, he was told what he was going to be charged with and was given the following preamble to the Miranda warnings:
“In a few minutes I’m going to read you your rights. After that, you’ll be given an opportunity to explain what happened at that date, time and place.
“If you have an alibi, give us as much information as you can, including the names of any people you were with.
“If your version of the events of that day is different from what we have heard, this is your opportunity to tell us your story.
*276 “If there is something you would like us to investigate concerning this incident, you must tell us now so we can look into it.”[6]
“the defendant: Okay.
“ms. piccone: Even if you have already spoken to someone else, you do not have to talk to me. This will be the only opportunity you will have to talk to me prior to your arraignment on these charges. This entire interview is being recorded with both video and sound.
“the defendant: Okay . . . .”
After the preamble, the defendant was given his Miranda warnings with the standard prompt — “Do you understand?”— after each right.
At that point, the defendant explained his version of the events. He said that he knew the complainant in that they both attended the same high school, Newtown High School. Further, they both had, at different times, a relationship with the same girl, Louisa, who attended Newtown High School with them. He further explained that the prior summer there was a fight between the defendant and the complainant over Louisa. The defendant further stated that he was badly beaten by the complainant during that fight, and as a result he received treatment at Elmhurst Hospital. The defendant told the interviewers that at the time of the incident that is the subject of the instant charges “we sparred, we argued, we fought. I broke his nose and some of his blood fell on my sneakers.” The defendant stated that the complainant’s iPod “fell down” and the complainant ran towards his house. The defendant said he picked the iPod up: “I did not rob it from him. I did not rob it— did not rob it from him.”
The defendant was later arraigned.
Shortly after the arraignment, ADA Schraeter was assigned to this case.[7] The ADA reviewed Hernandez’s statement, then Perez’s statement. ADA Schraeter then interviewed the complainant and asked him if he was sure about his identification of the defendants. The complainant said he was. Schraeter did not ask him how he was sure when the complainant was un *277 able to make an identification of either defendant at the showup arranged by the police. At this juncture, he had a complainant who said he was robbed and unable to identify any assailant and a defendant who claimed that he knew the complainant, assaulted him, but never robbed him.
Defense Arguments
The defendant argues that the District Attorney’s Office engaged in “improper conduct” by misrepresenting their intent when they explicitly promised to investigate what the defendant told them in his CBQ statement, and that this misrepresentation is an ethical violation warranting suppression of the defendant’s statements. The defendant notes that the prosecutor took the defendant out of the holding cell without asking him if he wanted to be a part of CBQ; that the District Attorney’s Office then set up an atmosphere of urgency by using words such as “you must tell us now so we can look into it,” that “[t]his will be the only opportunity you have to talk to me prior to your arraignment”; and that the script “assumes that the defendant is knowledgeable about the criminal justice system and knows what an arraignment is and that he will be assigned an attorney prior to it.” He contends that this procedure rendered his statement involuntary; further, that the People violated rule 8.4 (c) by making a false promise to investigate. The statement telling the defendant that if he possesses information that he wishes the prosecutor to investigate — presumably to assist the defendant — he should waive his rights and divulge that information, rather than wait until arraignment when he will be assigned an attorney to assist him, is clearly a promise to investigate.
The defendant asserts that it is clearly deceitful for an attorney to tell someone that you will assist him in investigating a claim of innocence or something which may be beneficial to his defense, but not actually investigate what is said.
Specifically, he contends that, by the time of his arraignment, the People possessed the statement of the defendant that there was a dispute over a girl from the previous summer, and that it was a fight, rather than a robbery, but they did not do an investigation as to that statement as promised.
Defendant finally argues that even if the prosecutor thought that the defendant’s story was not credible in that it did not coincide with the complainant’s story, they still had the duty to investigate as promised. Therefore, it is a material misrepresentation to say that you will investigate but do not.
*278 Defendant concludes that suppression pursuant to CPL 60.45 is the appropriate remedy.
People’s Arguments
The People argue that they did not engage in any improper conduct in contravention of their ethical obligations in obtaining defendant’s CBQ statement and, in any event, defendant’s statement was not “involuntarily made” under CPL 60.45. Therefore, they maintain that the court is precluded from suppressing the statement.
The People argue that the preamble does not contain a false promise to investigate in violation of rule 8.4 (c); that the preamble does not make any promise to investigate if the defendant makes a statement; and that “[c]ontrary to this Court’s expressed concern, there is no explicit or implicit promise contained in the statement ‘[i]f there is something you would like us to investigate concerning this incident, you must tell us now so we can look into it.’ ”
Additionally, the People claim that they did investigate this case even though ADA Garg, in CBQ, was not given any “concrete information that might suggest that the defendant had not been involved in the incident at all.” When ADA Garg was asked by this court about whether she attempted to verify that the defendant had been attacked the previous summer and had gone to the hospital, she stated that it would be up to the assigned assistant to conduct that interview.[8]
The People contend that the defendant’s statement “simply did not ring true under the circumstances” and they did not believe the codefendant’s CBQ statements. Nevertheless, ADA Schraeter recalled talking to the complainant only to ascertain if he was sure now about his identification of the defendant. “While ADA Schraeter could not recall if he specifically asked the complainant about whether he and the victim had fought over a girl, he believed that he ‘would have’ done so.” They also state that the assistant called Elmhurst Hospital to find out if defendant had been hospitalized “and may have taken other steps to obtain defendant’s hospital records, but did not ultimately receive any such records from the hospital.”
The People conclude that even if
“the ADA did not remember asking the complainant if he attended [Newtown] High School; did not *279 contact the school to inquire; was not sure if he asked the complainant if he had a girlfriend the previous summer; did not tell the complainant what Perez said; and was not sure if he had attempted to get medical records from the hospital prior to defense counsel providing them . . . this does not undermine the sufficiency of the People’s investigation or constitute a breach of any implied promise that might be read into the prefatory remarks; and it certainly does not rise to the level of an ethical violation.”
Finally, the People argue that regardless of the ethical issue, “the defendant’s statement in this case was unquestionably voluntarily made pursuant to section 60.45 of the Criminal Procedure Law as his constitutional rights were not violated, his will was not overborne, and he was not promised anything that could induce him to falsely incriminate himself.”
Discussion
A statement is not admissible at trial if it violates constitutional or statutory requirements,[9] including the Due Process Clause of the Fourteenth Amendment, Fifth and Sixth Amend- *280 merits of the United States Constitution, article I, § 6 of the New York Constitution,[10] or the mandates of Miranda.[11]
It is well-established — and a matter of constitutional dimension[12]— that in order for arrestees to be subjected to interrogation while in custody they must be advised of their Miranda warnings.[13] The People have a “heavy burden” to show that arrestees made a voluntary, knowing, and intelligent waiver of their Miranda rights.[14]
Further, in order for the statement to be admissible it must be voluntarily made, that is, a product of essentially free and unconstrained choice.[15] The voluntariness of statements is determined through a totality of the circumstances standard.[16]
In the instant case, there is no question that defendant was advised of his Miranda rights.
The first issue is whether the prosecutor’s preamble to Miranda in some way negated those warnings.
Prearraignment custodial interviews also raise constitutional as well as ethical concerns (see e.g. United States v Foley, 735 F2d 45, 48 [1984]).[17] The Federal Court of Appeals for the Second Circuit consistently raised issues about the Southern District’s prearraignment interview program, even though the court never declared the practice to be unconstitutional. Recently, Judge Scheindlin in the Southern District reminded courts that they should “remain troubled by the practice, not only because of its inherent compulsion implicating a defend *281 ant’s Fifth Amendment Miranda rights but, perhaps more importantly, because of its potentially adverse impact on the Sixth Amendment rights of indigent suspects” (United States v Gonzalez, — F Supp 2d —, —, 2011 WL 5994791, *8, 2011 US Dist LEXIS 137633, *25-26 [SD NY 2011]). The court found that the delay caused by the interview process “puts the indigent defendant at a comparative disadvantage” because the nonindigent defendant may have retained counsel (— F Supp 2d at —, 2011 WL 5994791, *8, 2011 US Dist LEXIS 137633, *26).
The procedure in the Southern District “specifically provides that where an interview may mean the difference between same day or following morning presentment, the interview ‘should be foregone’ ” (id.).
Judge Scheindlin concluded with: “Although such procedure, ‘if carefully applied’ is not ‘unlawful or unconstitutional, ’ it is nonetheless troubling” (id. [footnote omitted]).
The defendant argued that the People made false promises in the preamble to induce him to speak to them. The People argued that the preamble was intended to benefit the innocent defendant.
The court wished to determine whether the promises made in the preamble were, as the defendant suggested, an effort to undermine the Miranda warnings, or whether they were intended to do what the People represented to this court — give the defendant a chance to provide information so his claims could be investigated and the charges possibly reduced or dismissed.
Therefore, during several hearings connected with this proceeding, various members of the District Attorney’s Office were asked by this court if any of them conducted any investigation — either prior to or since arraignment — of the version of events given to them by the defendant. That is, the defendant’s claim that this was not a robbery but an assault by him of the complainant in retaliation for a beating he suffered at the hands of the complainant the summer before; further, that he never intended to take — and did not take — anything from the complainant by force. Nor did they check with Newtown High School to see if the complainant, Louisa, and the defendant were ever students there or to obtain any information regarding Louisa.
There was no evidence presented by the People as to any investigation by anyone in the District Attorney’s Office — either *282 prior to or since arraignment — based on what the defendant stated.
This court was troubled by this lack of investigation of the defendant’s claims. The defendant was specifically told that he was being given the opportunity to tell his version of the story, so that if it differed from the version understood by the District Attorney’s Office, his version would be looked into and investigated. The court viewed this statement as a promise to the defendant to induce him to speak to the members of the District Attorney’s Office. The defendant gave his version, and it differed in most material respects from the facts as understood by the District Attorney’s Office. And yet no investigation was forthcoming, no effort made to reconcile the very different versions, and no good reason given for the failure to do so.
In view of the failure to follow through on the promises made to the defendant, the court found the preamble read to the defendant, at the very least, a misrepresentation, if not deceitful. It was a misrepresentation made by the District Attorney’s Office to induce this defendant to speak to them right then, prior to his arraignment and to the assignment of counsel.
The court was aware that several colleagues had expressed the same concerns about the preamble read to defendants, and shared the same view about whether it was deceptive and undermined the Miranda warnings subsequently given to defendants.
For example, in People v Floyd,[18] Judicial Hearing Officer Demakos, in a recommendation to Justice Kron, reported that the statements made before the Miranda warnings violate Miranda in that they “primed the defendants to relinquish their rights before they were made aware of them . . . [T]he prefatory remarks obfuscated the defendant’s rights and converted the Miranda warnings themselves from an exclamation point to merely a footnote.” While Justice Kron denied suppression, he found that “ [nevertheless, the practice of the District Attorney’s Office to engage in pre-Miranda questioning of a defendant awaiting arraignment is a matter of concern.” He recommended that Miranda warnings be given first.
In People v Ferreira,[19] Justice Grosso, while denying the suppression of the CBQ statement, found confronting an unrepresented defendant to be facially unfair. While private counsel can file a notice of appearance causing the indelible right to counsel *283 to attach, indigent defendants, who have yet to have counsel appointed, do not have that opportunity.
In People v Comery,[20] while Justice Buchter found the CBQ program technically compliant with “existing precedent and the disciplinary rules of the Code of Professional Conduct,” not “so fundamentally unfair as to deny due process . . . nor so coercive as to undermine a defendant’s capacity for self-determination” and “does not constitute giving advice to an unrepresented defendant inasmuch as it does not explicitly recommend a course of conduct,” the court still felt “compelled to register my disapproval of the program.” First, he found that the CBQ program failed in fulfilling the prosecutor’s obligation to deal fairly with the defendant.[21] Second, he found the script to be deceptive.[22] Third, he found that the script undermined Miranda.[23] Fourth, he raised concern that the interviews occurred after a long journey to court and only moments before the indigent defendant will be assigned an attorney to represent him.[24] Fifth, he questioned the potential benefits of this program considering all *284 same “benefits” would be available shortly after the interview when the defendant is assigned an attorney and those benefits would not carry the “concomitant constitutional and ethical implications.”[25] Finally, he found that a simple remedy would be to have the Miranda warnings given to the defendant “then told that this was simply an opportunity to present his side of the story.”
This court also considered the misrepresentation to the defendant to be a possible violation of the rule of ethics prohibiting conduct by an attorney involving dishonesty, fraud, deceit or misrepresentation.
To help answer this question the court, pursuant to Rules Governing Judicial Conduct (22 NYCRR) § 100.3 (B) (6) (b),[26] and with notice to both parties, consulted Ellen Yaroshefsky.[27] Her report was received by the court and both parties were provided with a copy of it and time to respond pursuant to the Rules Governing Judicial Conduct (id.). Yaroshefsky found that the interview was not consistent with a lawyer’s ethical obligation in that it violated the Rules of Professional Conduct.[28] Specifically, she found that rule 8.4 (c) of the Rules of Professional Conduct (22 NYCRR 1200.0) was violated in that
“[t]he context of the interview misleads and deliber *285 ately induces the defendant to believe that there is an urgency to speak now when there is no advantage to him doing so prior to appointment of counsel. The conduct implies that there is a present advantage that will [be] unavailable at a later date. The detective and prosecutor know, but the defendant does not, that he will immediately secure counsel to provide independent advice as to whether and when he should provide information to the detective or the prosecutors. The prosecution knows that indigent defendants will not obtain counsel prior to the time of entry into the court’s holding cell and that the interview process delays and circumvents the defendant’s contact with counsel. In context, the fact that the defendant is read his Miranda rights at the end of the interview does not cure the misleading conduct.”[29]
As a part of the People’s response to Yaroshefsky’s report, the People submitted two of their own reports from Marc O. DeGirolami[30] and Joseph W Bellacsa.[31]
DeGirolami’s report was basically an analysis of Yaroshefsky’s report, which he found “overstated.” DeGirolami opined that *286 rule 8.4 (c) does not apply because it was never intended to punish “misleading” conduct: “Rather, by the terms of the rule itself, it targets dishonest, fraudulent, and deceitful conduct, as well as conduct in which a lawyer openly misrepresents material facts or law.”[32]
Bellacosa fully agreed with DeGirolami’s opinion statement and “thoroughly disagree[d]” with Yaroshefsky’s views and conclusions.[33]
The People also submitted an affirmation from the District Attorney.
“The purpose of the program is to determine the truth at the earliest possible moment. Sometimes the truth exculpates — sometimes it inculpates. Whether the truth will help or hurt the case is immaterial; the truth will assist us to do justice and prevent injustice. It was out of these concerns and with the goal of doing justice that the interview program was born to join the other things that my office does to make certain that we ‘get it right’. . . .
“The script was designed to enhance prosecutions against the guilty and to free the innocent. Portions of the script were specifically designed to impress upon the innocent the importance of providing us with information to establish his innocence at as early a stage in the proceedings as possible, so that we can investigate quickly and either dismiss the charges at arraignment, reduce them at the charging stage or recommend that favorable bail conditions be set while the claim of innocence is being investigated. The suspect is also informed that his interview is the last opportunity to speak to an assistant district attorney prior to arraignment and is informed as to what an arraignment is and what will occur at that arraignment.”[34]
The People instituted a CPLR article 78 proceeding to prevent this court from considering any ethics issue in determining the *287 suppression motion (Matter of Brown v Blumenfeld, 89 AD3d 94, 97 [2d Dept 2011]).[35] Their petition was denied.
This court has previously ruled that rule 8.4 (c)[36] can be a part of the totality of the CPL 60.45 analysis. While the People argue that courts have not ruled that rule 8.4 (c) applies to statements made by attorneys or on behalf of the District Attorney’s Office in prearraignment, the court notes that controlling courts have not ruled otherwise. In fact, when the Second Department in Matter of Brown v Blumenfeld (89 AD3d 94 [2011], supra), had the opportunity to do so, it left the door open. The Court stated that it could be considered as a part of a CPL 60.45 analysis in determining whether the statement was involuntarily made.[37]
The court finds that the preamble script is, at a minimum, a misrepresentation, if not actually deceptive. A detainee in CBQ hears that this is his only opportunity to speak to the *288 District Attorney’s investigator and assistant prior to arraignment. This creates an impression that the CBQ interview exists to assist the defendant. In this case the impression created was false.
At the time of the defendant’s interview he was in Central Booking awaiting arraignment. The People made it clear that he was about to be charged and what he was going to be charged with. What he was not told was that every benefit of his telling his side of the story to the prosecutor as an unrepresented detainee also existed on the other side of the door at arraignment. There, as an indigent defendant, he would be provided with an attorney. Under the Queens County District Attorney’s “no plea policy” there would be time for the prosecutor to investigate the defendant’s side of the story as told to them through the protective voice of defense counsel.[38]
This CBQ script also does not tell the defendant that the interrogation that would occur in CBQ if he waived his Miranda rights is remarkably similar to what would occur if he testified before the grand jury — except that if he went before the grand jury he could first discuss his testimony with his attorney and would have his attorney present to advise him if necessary.
The CBQ script also does not make the defendant aware that, if he is indigent, his attorney could get an investigator assigned under County Law article 18-B.
Nevertheless, at CBQ it is stated: “If your version of the events of that day is different from what we have heard, this is your opportunity to tell us your story. If there is something you would like us to investigate concerning this incident, you must tell us now so we can look into it.” (Emphasis added.)
The script gives the arrestee a false sense of urgency that it is now or never: “This will be the only opportunity you will have to talk to me prior to your arraignment on these charges.” (Emphasis added.)
At the end of the final proceeding, Chief Assistant District Attorney Ryan asked to address the court regarding the CBQ *289 program and preamble. He explained that the office decided to have the entire CBQ interview on video — something this court can only praise — and that they would follow a script. He explained that the reason the statements made by the District Attorney’s Office precede Miranda warnings was so that they could tell — “And I say statement. There is not a single question in there” — the arrestee would know who they were and what they were doing there.
However — unlike Miranda — there was never an opportunity for the arrestee to state after each statement that he even understood each statement. Second, the preamble contains statements that are not a part of “our national culture” unlike the warnings in Miranda (.Dickerson v United States, 530 US 428, 443 [2000]), and as such are more likely not to be understood by nonlawyers, especially a first-time arrestee like the instant defendant.
Another reason proffered was that it was an opportunity to develop a rapport prior to giving the Miranda warnings:
“the court: [W]hy is there a preamble[?]
“mr ryan: Well, that’s part of the script.... I don’t think I’ve ever heard of a statement given by a defendant where the first words out of the cop’s mouth was Miranda. One of the best detectives I ever worked with would talk to the defendant for as long as defendant wanted to talk about basketball, said he had to develop a rapport with him.
“He would not ask him anything about his self or anything else. He would talk basketball. Once he would have the rapport, he would give him Miranda. So that is what I brought to the table in this debate.”
The court finds that the preamble misleads a defendant into believing that the prosecutor is there to help him out. It suggests that speaking to the prosecutors will benefit him because they will investigate “his side of the story” if it differs from what the prosecutors knew at the time of the interview.
But none of that occurred here. The defendant’s side of the story was not investigated. And to the extent any limited inquiries were made by the District Attorney’s Office, they were *290 done after arraignment, not prior to it when there was a chance for potential charges to be reduced or dropped.[39]
The facts bear out that the prosecutor did conduct an investigation of what he believed, but not of the defendant’s story as promised at the CBQ interview.
Therefore, the court finds the preamble to be misleading and deceptive,[40] violative of rule 8.4 (c). And the preamble does not *291 appear to be “carefully applied” as that term was used by the Southern District in United States v Perez (733 F2d 1026, 1036 [1984]).
In light of this finding the question is whether the statement is admissible pursuant to CPL 60.45. A defendant’s statement is “involuntarily made” and may not be received in evidence against a defendant in a criminal proceeding, if it is obtained “[b]y any person ... by means of any . . . improper conduct or undue pressure which impaired the defendant’s . . . mental condition to the extent of undermining his ability to make a choice whether or not to make a statement” (CPL 60.45 [2] [a] [emphasis added]).
In the instant case, the court finds that the improper conduct is the promise that the People made prior to the issuance of the Miranda warnings that they would investigate what was told, followed by their failure to do so. However, it does not answer the question whether the improper conduct impaired the defendant’s mental condition to the extent of undermining his ability to make a choice whether or not to make a statement. Throughout all these hearings, the defendant never testified. The court does not know, for example, whether he made the statements at CBQ because he felt he “must” in order to give his side of the story or whether he even understood anything in the preamble.[41] All the court is left with to determine whether the People’s ethical violation impaired his mental ability to make a choice is the video of the interrogation, and from that it is impossible to determine whether it undermined his ability.[42]
*292 Accordingly, the motion to suppress pursuant to CPL 60.45 is denied.
However, because the opinion of the court is that the failure to keep the promises made to this defendant in the preamble clearly violated rule 8.4 (c), the court must fashion an appropriate sanction.
Although the People argued that there was no violation, they nevertheless offer as appropriate remedies: (1) dismissal in the furtherance of justice; or (2) to report the offending lawyer for ethical violation.
Dismissal in the furtherance of justice. A dismissal in the furtherance of justice (CPL 210.20 [1] [i]) is available in rare instances. Nevertheless, neither party has made such a motion and the court has no desire to entertain this draconian remedy sua sponte especially since the defendant’s version includes an unprovoked assault on the complainant.
Reporting. Reporting the person who is responsible for the violation is interesting; however, the prosecutor has not suggested who that person would be: the assistant(s) present in the CBQ room when the script is being read; the assistant who was assigned later and who failed to investigate even though he never made the promise;[43] the assistant(s) who devised the script;[44] the District Attorney himself? It is not clear here that any one attorney was responsible for the violation. This appears *293 to be an office failure. As such, the sanction should apply to the office.
It is well established that courts have an obligation, if they become aware of an ethical breach, to report the attorney who committed the ethical breach or fashion an alternative sanction. Judges can take appropriate steps to regulate the conduct of lawyers appearing before them, short of formal discipline (see Matter of First Natl. Bank of E. Islip v Brower, 42 NY2d 471, 474 [1977]). Under the Code of Judicial Conduct, “[a] judge who receives information indicating a substantial likelihood that a lawyer has committed a violation of the Code of Professional Responsibility shall take appropriate action” (22 NYCRR 100.3 [D] [2]). Under rule 2.15 (D) of the American Bar Association Model Code of Judicial Conduct, “[a] judge who receives information indicating a substantial likelihood that a lawyer has committed a violation of the Rules of Professional Conduct shall take appropriate action.” Pursuant to Judiciary Law § 2-b (3), “[a] court of record has power ... to devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it.” And finally, “[t]he supreme court shall have power and control over attorneys and counsellors-at-law and all persons practicing or assuming to practice law” (Judiciary Law § 90 [2]).
The court believes that preclusion would be an appropriate sanction in this case. By precluding the introduction of the defendant’s CBQ statement during the People’s direct case at trial, the court would be assuring that the People are not able to benefit from their improper conduct. This is the purpose of a judicial sanction.[45]
Accordingly, the People will not be permitted to offer the defendant’s CBQ statement during its direct case at trial.

. Defendant Perez is charged with two counts of robbery in the second degree (Penal Law § 160.10 [1], [2] [a]) and one count of criminal possession of stolen property in the fifth degree (Penal Law § 165.40). In an omnibus motion, dated July 3, 2009, defendant Perez moved, inter alia, to suppress: (1) physical evidence seized from the defendant; (2) the statement made prior to *274 the arrest; (3) the statement made orally and in writing at the precinct; and (4) the statement made to the People in the prearraignment interrogation by the Queens District Attorney’s Office at Central Booking. A Huntley/Wadel Mapp/Dunaway hearing was held on November 19, and December 2, 11 and 18, 2009. The first three issues were resolved in an interim order dated August 12, 2010. The motion to suppress physical evidence was granted. The showup procedure used was proper under the law; however, the complainant could identify an iPod with headphones, but not the defendant. There is nothing to suppress as a result of this procedure. The motion to suppress the precinct statements was denied. The last issue — the statement made to the People in the prearraignment interrogation in the Queens County District Attorney’s Office at Central Booking — was subject to further proceedings. These included a denied CPLR article 78 petition before the Second Department of the Appellate Division (89 AD3d 94 [2011]), and a final hearing and arguments.

. (Code of Professional Responsibility DR 1-102 [a] [4] [22 NYCRR] 1200.3 [a] [4], now Rules of Professional Conduct [22 NYCRR 1200.0] rule 8.4 [c] [new rules eff Apr. 1, 2009]). The differences between the two sets of rules are insignificant when applied to the instant case. The prohibitions on fraud and deceit in rule 8.4 of the Rules of Professional Conduct and former DR 1-102 (a) (4) are the same.

. At the precinct, the defendant wrote the following statement that was translated through use of a senior court interpreter:
“I am writing for this so I can get out of this problem I had and the truth is I never wanted to harm anyone and I have never before been jailed in a jail but some time ago someone gave me a beating and left me unconscious and back then I was unable to do anything but then again I found this same person and I fought with him and caused him to bleed a little and blood fell on my sneakers and when I was leaving [unintelligible] and his ipo [sic] fell and I picked it up but I did not take it by force or anything like that I only kept it so that another person would not take it but he made it worse for me and I only tried to make him understand that I did not want to hurt him or anyone else” (the document in Spanish did not contain any punctuation).

. Several months prior, ADA Garg had interviewed Hernandez on an unrelated manner, though she testified that she did not recall that during his CBQ interview and it was only when, at the end of the interview, she looked at his arrest record, that she recalled the previous CBQ interview (transcript at 157).

. This paragraph is no longer the standard language in the CBQ script. The word “must” has been removed. The language that replaced this language is: “If there is something you would like us to investigate concerning this incident, if you tell us about it, we will look into it” (Matter of Brown v Blumenfeld, 89 AD3d 94, 98 n 2 [2011]).

. He was also assigned to the codefendant’s unrelated case.

. Transcript at 161, 174.

. (CPL 710.20, 60.45; see e.g. People v Lugo, 60 AD3d 867 [2d Dept 2009]). Motion to suppress evidence is governed by CPL 710.20. Among the grounds are “[c]onsists of a record or potential testimony reciting or describing a statement of such defendant involuntarily made, within the meaning of section 60.45.” (CPL 710.20 [3].) CPL 60.45 is the “rules of evidence” as it pertains to the “admissibility of statements of defendants”:
“1. Evidence of a written or oral confession, admission, or other statement made by a defendant with respect to his participation or lack of participation in the offense charged, may not be received in evidence against him in a criminal proceeding if such statement was involuntarily made.
“2. A confession, admission or other statement is ‘involuntarily made’ by a defendant when it is obtained from him:
“(a) By any person by the use or threatened use of physical force upon the defendant or another person, or by means of any other improper conduct or undue pressure which impaired the defendant’s physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement; or
“(b) By a public servant engaged in law enforcement activity or by a person then acting under his direction or in cooperation with him:
“(i) by means of any promise or statement of fact, which promise or statement creates a substantial risk that the defendant might falsely incriminate himself; or
*280 “(ii) in violation of such rights as the defendant may derive from the constitution of this state or of the United States.”

. People v Anderson, 42 NY2d 35, 37 (1977); see People v Tarsia, 50 NY2d 1 (1980).

. Miranda v Arizona, 384 US 436 (1966); People v Parker, 57 NY2d 815 (1982); see People v Yukl, 25 NY2d 585 (1969).

. Dickerson v United States, 530 US 428, 439-440 (2000).

. Miranda v Arizona, 384 US 436 (1966).

. Miranda v Arizona, 384 US 436, 475 (1966); Matter of Jimmy D., 15 NY3d 417 (2010).

. Arizona v Fulminante, 499 US 279 (1991); Colorado v Connelly, 479 US 157 (1986); Schneckloth v Bustamonte, 412 US 218 (1973); People v Anderson, 42 NY2d 35 (1977); People v Sanderson, 68 AD3d 1716 (4th Dept 2009); People v Packer, 49 AD3d 184 (1st Dept 2008); People v Strempack, 134 AD2d 799 (3d Dept 1987); People v Abrams, 95 AD2d 155 (2d Dept 1983).

. People v Mateo, 2 NY3d 383 (2004).

. “We now add our voice to the growing chorus of judges who ‘remain troubled by the practice’ ” (735 F2d at 49, quoting United States v Perez, 733 F2d 1026, 1036 [1984]; United States v Mohabir, 624 F2d 1140 [1980]; United States v Duvall, 537 F2d 15 [1976]).

. Indictment No. 3034/2008.

. Indictment No. N10208/2009.

. Indictment No. 1376-2008.

. “[T]he Office of the District Attorney risks disrupting the fragile balance that a prosecutor must maintain in exercising his dual roles as advocate and public officer (People v Pelchat, 62 NY2d 97, 105 [1984]). In their role as public officers, prosecutors have an obligation to deal fairly with the accused (People v Steadman, 82 NY2d 1, 7 [1993]; People v Pelchat, 62 NY2d at 105). This court believes that this program fails to do so.”

. “Contrary to the contention of the District Attorney, the script is deceptive. For the unrepresented defendant, it creates a false impression that the ADA is there to assist him. Further, defendant is told that this is his only opportunity to speak to the investigator prior to arraignment. The defendant is not told that he may provide notice of alibi after arraignment (see CPL 250.20) or that exculpatory evidence may be presented to the authorities at any time. Thus, an erroneous impression may easily be created.”

. “In addition, the script prompts of defendant to relinquish his rights before he is made fully aware of them. The defendant is urged to provide his side of the story before he is warned that anything he says, including the story so provided, may be used against him in court. In first telling him that his rights at arraignment including having an attorney appointed to represent him, the script unnecessarily undermines the subsequent Miranda warning that he can have an attorney appointed before questioning, or at any time.”

. “Apart from the problem created by the script, the interviews conducted by the Assistant District Attorneys occur after the defendant has spent many hours in jail. They may follow extended! *284 nterrogation by police officers. Perhaps most importantly, they occur shortly before an indigent defendant will be assigned an attorney to represent him.”

. The Office of the District Attorney argues that the program in fact benefits defendants by allowing the reduction, or even dismissal, of charges based on what is told to them. However, these benefits could just as well be achieved after arraignment, without the concomitant constitutional and ethical implications.

. “(6) A judge shall accord to every person who has a legal interest in a proceeding, or that person’s lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers concerning a pending or impending proceeding, except: . . .
“(b) A judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and a copy of such advice if the advice is given in writing and the substance of the advice if it is given orally, and affords the parties reasonable opportunity to respond.”

. Clinical professor of law and director of the Jacob Burns Center for Ethics in the Practice of Law at Cardozo School of Law.

. The Code of Professional Responsibility was in effect when the defendant was interviewed. Nevertheless, the provisions cited by professor Yaroshefsky are the same in both the Code and the Rules.

. (Letter dated Apr. 14, 2010, at 5-6.) Her complete report can be found at http://www.scribd.com/ doc/39362703/District-Attorney-Richard-A-Brown-s-Petition (exhibit 11 at 386).

. Assistant professor of law at St. John’s University School of Law. His complete report can be found at http://www.scribd.com/doc/39362703/DistrictAttorney-Richard-A-Brown-s-Petition (exhibit 15 C at 256).

. Former New York Court of Appeals Judge and former dean and professor of law at St. John’s University School of Law. His complete report can be found at http://www.scribd.com/doc/39362703/District-Attorney-Richard-ABrown-s-Petition (exhibit 15 B, at 240). The court means no disrespect whatsoever by not using the honorific title of Judge when referring to Bellacosa:
“The Model Rules do not, however, expressly address whether it is ethical for a former judge to encourage others to refer to him as ‘Judge’ in the courtroom or otherwise in connection with legal proceedings. This Committee, in Informal Opinion No. 1448, expressed the view that, with respect to jury trials, ‘such a practice would be not only unseemly but could, in some instances, pose a substantial threat to the impartial determination of issues which the jury is intended by our judicial system to make.’ ABA Informal Opinion No. 1448 (1979). The Committee believes that that Opinion remains sound under the Model Rules, and also that, for the reasons set forth in that Opinion as well as in Informal Opinion No. 1006, the title ‘Judge’ should not be used at all in the courtroom, or otherwise in connection with legal proceedings, to refer to a former judge who is appearing on behalf of a client or as an expert witness” (ABA Comm on Ethics and Prof Responsibility Formal Op 391 [1995]).

. Mem of DeGirolami at 6.

. “I frankly found her letter opinion to be puzzling, unfounded and ironically bordering on irresponsibly unprofessional conduct in and of itself, under the analysis and standards of Matter of Holtzman, [78 NY2d 184], as it might pertain to her attributed accusations” (affirmation of Bellacosa, dated July 23, 2010, at 8).

. (Affirmation at 2-3.) His complete affirmation can be found at http:// www.scribd.com/doc/ 39362703/District-Attorney-Richard-A-Brown-s-Petition (exhibit 15 A at 220).

. This article 78 attracted much attention in that there were seven amici curiae briefs filed from: (1) Thomas M. O’Brien, New York City, for Legal Aid Society, amicus curiae; (2) Green & Willstatter, White Plains (Richard D. Willstatter of counsel) and Mintz & Oppenheim LLP, New York City (Marshall A. Mintz of counsel), for New York State Association of Criminal Defense Lawyers (one brief filed), amicus curiae (http:// nysacdl.dreamhosters.com/wp/wp-content/uploads/2010/ll/Brown-vBlumenfeld- Nov-2010.pdf); (3) Lawrence J. Fox, New York City, and for Monroe H. Freedman and others, amici curiae (http://www.nylj.com/nylawyer/ adgifs/decisions/122010profs.pdf); (4) Frankfurt Kurnit Klein & Selz, EC., New York City (Ronald C. Minkoff pro se, Lia N. Brooks, Ellen Brotman pro se, Lawrence J. Fox pro se, Peter Margulies pro se and J. Richard Supple pro se of counsel), for New York County Lawyers Association Ethics Institute and others, amici curiae (http://www.nycla.org/siteFiles/Publications/ Publicationsl408_0.pdf); (5) Schulte Roth & Zabel LLR New York City (Michael E. Swartz, Sami B. Groff and Katherine L. Scheuerman of counsel), for New York Council of Defense Lawyers, amicus curiae; (6) Arthur Eisenberg, New York City (John Kenneth White, Taylor Pendergrass and Christopher Dunn of counsel), for New York Civil Liberties Union, amicus curiae (http:// www.nycla.org/siteFiles/Publications/ Publications1408_0.pdf); (7) James E Maxwell, Syracuse (Victoria M. White of counsel), for District Attorneys Association of State of New York, amicus curiae. The first six were on behalf of the respondent and the last one was on behalf of the petitioner.

. Former DR 1-102 (a) (4) of the Code of Professional Responsibility (22 NYCRR former 1200.3 [a] [4]) prohibits an attorney from engaging in conduct “involving dishonesty, fraud, deceit or misrepresentation. ”

. “If Justice Blumenfeld considers and makes a finding with respect to whether the AD As conducting the interview of Perez violated ethical rules, he would be doing so in determining a motion he is ‘authorized’ to entertain (Matter of Lungen v Kane, 88 NY2d at 862, quoting Matter of Holtzman v Goldman, 71 NY2d at 569), namely, a motion to suppress a statement on the ground that it was involuntarily made” (id. at 103-104).

. (See United States v Gonzalez, — F Supp 2d —, 2011 WL 5994791, 2011 US Dist LEXIS 137633 [2011], supra.) The District Attorney is well aware of this and it is indeed built into the program: “Once the case is docketed and the charges are formally filed, the defendant’s right to counsel indelibly attaches, effectively barring any further communication between the defendant and the District Attorney’s Office” (affirmation of District Attorney Brown at 3).

. The court notes that the People’s own expert stated that his interpretation was that the investigation would be prior to arraignment. The People’s own expert, DeGirolami, analyzed the use of the term “must” to mean:
“[T]he suspect ‘must’ speak to the government only ‘if there is something [he] would like [the government] to investigate concerning this incident.’ In light of the imminency of arraignment (a fact communicated to the suspect), the context of the use of the word ‘must’ is reasonably understood to mean that the government intends to inform the suspect that if the suspect wishes the government to investigate his factual claims prior to arraignment, he ‘must’ come forward with those facts ‘now.’ If not ‘now, ’ there will be no time before arraignment to investigate them” (mem from Marc DeGirolami, dated July 26, 2010, at 8 [emphasis added]).

. The court is also concerned that the preamble undermines Miranda. Prior to the issuance of Miranda, the prosecutor tells the defendant why he should not remain silent and implies that any statement he makes could help him. Since there is no prompt as to whether the arrestee understands the preamble, it is somehow assumed that the arrestee understands the preamble. The arrestee — not knowledgeable on the law — is being told why he should not remain silent. Unlike Miranda’s warning of the consequences of speaking— anything you say can be used against you in court — what the prosecutor is doing here is telling the arrestee of the potential consequences of remaining silent. The prosecutor is telling the defendant basically we have the story from the other side — the basis of the charges we just told you — and if you want us to listen to your side and investigate your side, this is when you tell us. The arrestee does not have the benefit of a legal education to know of the nuances of the District Attorney’s statement. The defendant may not realize that this questionable statement, “you must tell us now,” is contrary to what he is about to hear with the Miranda warnings. These warnings differ from what the police previously told them when they recited just the Miranda warnings. This time he is being told of the importance of telling the State his side of the story and telling prior to arraignment, prior to getting an attorney assigned to him.
The court is also deeply concerned that the CBQ program only applies to indigent defendants and not those who, by reasons that they can afford the retention of counsel, have counsel. The CBQ program, as described by the District Attorney, only applies to indigent defendants because
“after docketing th[en] the case is referred to the various indigent counsel agencies (Legal Aid Society, Queens Law Associates or 18-B attorneys) to determine if the defendant is eligible for free legal assistance. Once the case is docketed and the charges are formally filed, the defendant’s right to counsel indelibly attaches, *291 effectively barring any further communication between the defendant and the District Attorney’s Office.”
The People have provided the part of the Legal Aid Society (LAS) contract pertaining to assignment. It prohibits the LAS from representing arrestees prior to the assignment at arraignment. Therefore, indigent arrestees do not have retained, nor assigned, attorneys that would notify the District Attorney’s Office to interview the arrestee.
The conversation between defense counsel and the prosecutor would exist once the right to counsel attached for the indigent, just not between the unrepresented indigent counsel and the prosecutor.

. This case is the defendant’s first arrest, at which time he was an immigrant teenager for whom English is a second language.

. The defendant made a similar statement to the police upon arrest also after receiving Miranda warnings and seemed eager to repeat it on the video. As with the decisions of my colleagues cited above, without the defendant’s testimony that he did not understand what he was being told, how can the court determine that his ability whether to make a statement was undermined. (See also n 37.) Without his testimony, one cannot tell if his eagerness was *292 aproduct of his belief that this was his one and only opportunity to have his version of the events investigated.

. It is questionable as to whether the District Attorney’s Office ever took anything the defendant stated seriously. Had they done so, they would have not only investigated what he said, but also would have indicted him for an assault, separate from the indicted robbery and criminal possession counts. In the case of a prosecutor, all of the ethical obligations of a lawyer they have to the client flows not to the complainant, but to the public, because the client is the people (see People v Harris, 154 Misc 2d 554, 558 [1992] [“A public prosecutor does not represent the complainant in a criminal action, but rather, represents the interests of the government and those of the people at large.”]; see also Berger v United States, 295 US 78, 88 [1935]; People v Zimmer, 51 NY2d 390, 393 [1980]).

. The programmatic solution that was recognized by my colleagues a few years ago remains the easiest and simplest solution: Simply do what other prosecutor’s offices do on video prior to arraignment — introduce yourself, give arrestees the Miranda warnings and ask them if they want to talk. When Miranda was first being implemented, many critics thought it would be the end of statements by defendants. However, studies show that Miranda has not stopped arrestees from making statements (see e.g. Richard A. Leo, Questioning the Relevance of Miranda in the Twenty-First Century, 99 Mich L Rev 1000, 1012-1015 [2001] [“the overwhelming majority of suspects (some 78% to 96%) waive their rights”]).

. The court notes that the People will still be able to have the defendant’s similar statement to the police at the precinct to use at trial.